UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THE UNITED STATES OF AMERICA,

    -against-

JAYSON VASQUEZ-SOTO,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER

11 Cr. 986-02 (GBD)

GEORGE B. DANIELS, United States District Judge:

  Defendant Jayson Vasquez-Soto was arrested in December 2011 and ultimately charged with a sole count of obstruction of justice in violation of 18 U.S.C. § 1512(c)(1).[1] The Government contended that Defendant wiped fingerprints off of a vehicle he drove as a getaway car in an attempted murder for hire so as to make the prints unavailable to law enforcement. Defendant conceded that he helped wipe fingerprints from the vehicle. The central issue for the jury was whether the Defendant acted "corruptly" within the meaning of the statute. Defendant contended that he did not act corruptly but rather out of fear. After a weeklong trial, the jury returned a guilty verdict on February 1, 2013.

  Defendant now moves for a new trial pursuant to Fed. R. Crim. P. 33(a), which allows a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); Eberhart v. United States, 546 U.S. 12, 13 (2005). Defendant argues that he was denied a fair trial (1) by certain statements in the Government's rebuttal summation and (2) when the Court failed to exclude what the Defendant characterizes as a "mug shot"

---

[1] The relevant portion of the statute reads, "[w]hoever corruptly--(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding . . . [shall be guilty of a crime]." 18 U.S.C. § 1512(c)(1).

1

photograph of him. Defendant's motion is denied.

"[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)). The motion "should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." United States v. Triumph Capital Group, Inc., 544 F.3d 149, 159 (2d Cir. 2008) (quoting Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotation marks omitted). The defendant bears the burden of proving that he is entitled to a new trial. McCourty, 562 F. 3d at 475.

## The Government's Rebuttal Summation Did Not Prejudice the Defendant

Legal Standard

Improper statements made during summation mandate a new trial when such statements "cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999). In determining whether improper statements rise to this level, courts consider (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct. United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002). "Rebuttal summation provides the Government an opportunity to respond to the defense's arguments." United States v. Faisal, 282 Fed. Appx. 849, 850 (2d Cir. 2008). The Government "may not use the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial." United States v. Rubinson, 543 F.2d 951, 966 (2d Cir. 1976).

1. Display of the Phone Record During Rebuttal Was Not Improper

Defendant argues that the Government's rebuttal summation prejudiced him in three ways. First, he argues that the Government's display of Government Exhibit 502, a phone record admitted into evidence memorializing a phone call from Defendant's phone to one used by Boris Lisyansky (the alleged organizer of the murder for hire) the day after the shooting was improper fodder for the Government's rebuttal because it exceeded the scope of defense counsel's summation. He also argues that it was misleading because the Government only blew up and displayed a portion of the exhibit, and that portion excluded the fact that the phone call lasted nine seconds.

In his summation, Defendant's counsel made the following argument about the phone records in evidence:

> Mr. Fischman [the prosecutor] put up a series of phone records, pointed to them, and told you what these conversations that supposedly occurred were, who was talking to who about what. There is not a stitch of evidence in this case about any of the things that Mr. Fischman pointed to in that discussion. <u>There is not a stitch of evidence in this case that Jayson Vazquez was speaking to Boris when he puts up a phone record of Jayson's phone in a call to Boris</u>. There is not a stitch of evidence of that. What there is evidence of is that Jayson was with Jesus [Rosa, the shooter] and Jesus used his phone. Jayson told the police that both Rosa and Gady used his phone. The government has offered nothing to dispute that statement.

Tr. at 492:17-493:3. In its rebuttal summation, the Government responded to this argument by pointing to a phone call that clearly came from the Defendant in Puerto Rico after the crime, not Jesus or Gady who were still in New York:

> MR. WILSON [the other prosecutor]: Ladies and gentleman, Mr. Komaroff just told you that there is not a stitch of evidence that the defendant was part of the criminal team on the day of the shooting, not a stitch of evidence that he ever spoke to Boris, that Jesus was the one who was speaking to Boris, that the

3

> defendant didn't know anything about it. Can we put up Government Exhibit 502, page 317.
>
> MR. KOMAROFF: I object to the mischaracterization of what I said; I never said he never spoke to Boris.
>
> THE COURT: Overruled. The jury heard what both of you said. They will make their own judgment.
>
> MR. WILSON: The call that starts at 9:01 a.m. [and] 45 seconds. Blow that up. This is a call on May 28, 2010 at 9:01 a.m., the day after Jayson goes back to Puerto Rico. Undisputed. This is a call from Jayson's phone number 787-677-8132, his phone records, to the 4900 number, to Boris. Is Jesus with Jayson in Puerto Rico the day after the shooting? No, no, he is not. Is Gady with Jayson in Puerto Rico the day after the shooting? No, no he is not. There is no one there for the defendant to blame this call on. The day after the shooting, Mr. Vazquez-Soto calls the man who he had nothing to do with who he is terrified about all on his own.

Tr. at 494:11-495:7. The Government's argument did not exceed the proper scope of rebuttal summation and did not prejudice the Defendant. It employed an exhibit in evidence to demonstrate that the Defendant called Lisyansky on the day after the shooting. It did so in response to Defense counsel's argument that there was "not a stitch of evidence in this case that Jayson Vasquez was speaking to Boris. . . ." Tr. 492:21-23. The Government was entitled to respond to that argument, and properly did so with the exhibit admitted in evidence.[2] As this Court stated at the time to defense counsel, this was "clearly rebuttal of your argument that the phone calls don't reflect any relationship between Boris and your client." Tr. 513:9-11.

2. Rebuttal Regarding the Consistency of Translation Was Not Improper

Second, the Defendant argues that the Government mischaracterized the testimony of his

---

[2] Defendant's argument that the Government's display of a portion of the phone record was misleading because the emphasized portion omitted the fact that the call lasted nine seconds is also without merit. When the Government first displayed Exhibit 502 in its rebuttal summation, it displayed the entire page of the phone record, including information about the duration of each call on the page. The Government then zoomed in on the relevant phone call. Defense counsel could have referenced the call and its duration during his summation had he anticipated the Government's proper and effective rebuttal. The Jury was also entitled to request the entire exhibit for inspection during its deliberation, had it wished to examine it further. The mere fact that the Defendant telephoned Lisyansky—regardless of the amount of time they spoke—directly undercut defense counsel's argument that the Defendant was scared of Lisyansky and therefore avoided speaking independently to him.

4

statements to law enforcement. The Defendant claims that the Government's rebuttal summation left the jury with the false impression that the Defendant had confessed to knowingly committing a crime in two different interviews, and that this mischaracterization of the evidence caused the Defendant prejudice.

At trial, the Government introduced evidence that the Defendant was interviewed by law enforcement on October 25, 2010 and October 27, 2010. Both interviews took place largely in Spanish. The first interview was translated for those in the room by Sergeant Claudia Bartolomei. At trial, Sergeant Bartolomei testified that the Defendant admitted to her in that interview that he knew he was committing a crime. Tr. 221:18-19. FBI Special Agent Robert Conrad, who was in the room and listening to Sergeant Bartolomei's translation, also testified that the Defendant stated that he knew he was committing a crime in that interview. Tr. at 282:24. The defense heavily attacked the credibility of Sergeant Bartolomei in its summation, suggesting that she had mischaracterized or mistranslated the Defendant's statement that he knew he was committing a crime.

The second interview was translated by FBI Special Agent Scarly Penaherrera, who did not testify at trial and whose credibility the defense did not call into question. Agent Conrad was also in the room for this second interview. On direct examination, the Government asked Agent Conrad, "Did Mr. Vazquez-Soto[,] just to be clear[,] change or contradict any aspect of his story from the prior interview during this interview?" Tr. 294:8-10. Agent Conrad answered, "No." Tr. 294:11.

In its rebuttal summation, the Government responded to the defense counsel's attack on Sergeant Bartolomei's credibility by pointing out that even with a different translator, the Defendant's version of events did not change.

5

> MR. WILSON: And just, again, to -- one more piece, they have another interview two days later. That's not Sergeant Bartolomei translating. That's the FBI agent Scarly Penaherrera. And then I asked Agent Conrad, "Did you talk about the day?" He said, "Yes." I asked him, "Did anything change, where it would be contradicted? Did he switch his answers?" And he said, "No, he's consistent." Different translator. No one there ever twisted the words.
>
> MR. KOMAROFF: Objection. Objection. Objection. There is not a stitch of evidence --
>
> THE COURT: Overruled. Mr. Komaroff that is why I always instruct the jury just before we start, so we don't have to go through this, it's their recollection of the testimony that controls. If they have any issue about what you said or what Mr. Wilson said, we can ask to have the transcript read back, and then there won't be any issue.
>
> MR. WILSON: I'll be happy to be clear. There's no particular testimony that -- Mr. Komaroff heard the exact same words the same day. The point is the translation was the same both days. Sergeant Bartolomei wasn't switching things around when he would say one thing, but she would translate it to another. She was translating what he said from Spanish to English, just like they're doing in the courtroom for Mr. Vazquez-Soto right now.

Tr. 503:9-504:7. This challenged portion of the Government's summation is not misleading. The Government was responding to the defense's argument that Sergeant Bartolomei's translation could not be trusted and "it's all Sergeant Bartolomei telling you what happened." Tr. 484:12-13. The Government went out of its way to make clear that Agent Conrad did not testify that he "heard the same exact words" from the Defendant in both interviews. Tr. 504:1-2. The Government simply rebutted the defense counsel's argument that Sergeant Bartolomei mistranslated the first interview by demonstrating that the Defendant did not change his story during the second interview, which was conducted with a different translator. Further, the Court make clear (on more than one occasion and in response to this precise issue) that the jury's recollection of the testimony controls. This was not an improper mischaracterization of the testimony at trial, much less one that caused the Defendant any prejudice.

6

### 3. The Defendant Was not Prejudiced by Improper "Vouching" by the Government

Third, the Defendant argues that the AUSA injected his own personal opinions concerning the evidence on rebuttal, and that such statements constitute improper "vouching" for the Government's case. The Defendant cites five examples of such vouching:

(1) The whole reason that he says he was scared of these men because they knew where he lives is because Gady knew where he lived, because Gady knew where he worked, so he goes and tells Gady where they can find him [in Puerto Rico] because he is so scared that they will track him down. <u>I don't want to spend too much time to belabor the point and give more credence to this argument than it deserves. It's ridiculous.</u> He wasn't scared of these men. He didn't care if they knew where he was. That's why he is calling them the day after the shooting. Tr. 496:20-497:4.

(2) Let's talk about how it is that he leaves out all of these important details about what happened after they drive away from the shooting. <u>I find it hard to imagine the circumstances where his story could make any sense at all to begin with.</u> Let's pretend for a moment that it was anywhere close to true. The defendant had had this experience. The police come to him. No sense side [sic.] in hiding. He gives up Boris and Jesus even though he is scared. This is his chance to tell law enforcement about how they made him do all these things, about how he was threatened, about how he was scared. . . . He doesn't do it. Tr. 498:13-22; 499:1.

(3) The October 25, 2010 statement, Mr. Komaroff spent some time on this and all the ways in which he admitted the really damning portions are not reliable, but the stuff that could conceivably help his client is entirely accurate. The basis for that is essentially that sergeant Bartolomei, the head of the detective squad in Queens with 30 years of experience, that she is unreliable, and I guess the theory is just making things up. <u>It's an outrageous argument. I don't want to spend a lot of time with this.</u> Mr. Komaroff didn't try to identify any reason why sergeant Bartolomei would in the middle of interviews as they are happening concoct damning statements and try to pretend they were the translated statements the defendant made. Tr. 500:1-13.

(4) This is the suggestion that Sergeant Bartolomei mid-translation changed what the defendant was saying into an admission that he didn't make; that he knew he was committing a crime. <u>Again, it's ridiculous -- and I almost don't want to dignify it too much</u> -- but the very next day -- or, excuse me, -- two days later, there was a separate interview. Tr. 501:25-502:6.

(5) Let's talk about a few of the comments made about some of these other witnesses. A suggestion that Mikhael Zavolunov, the father of the victim, is in here lying or shading his truth or pretending he remembers things he doesn't remember to get a

7

man he has never seen before or doesn't know <u>-- it's just -- it's preposterous. It's ridiculous</u>. There's not a shred of evidence for that, and <u>I don't believe this jury should give it any credence</u>. Tr. 504:8-15.

Prosecutors may use "colourful adjectives" in summation. <u>United States v. Rivera</u>, 971 F.2d 876, 884 (2d Cir. 1992). An improper remark by a prosecutor will justify a new trial "only if it causes the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." <u>United States v. Shareef</u>, 190 F.3d 71, 78 (2d Cir. 1999). A prosecutor's comments may constitute improper vouching if they relate the "personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." <u>United States v. Carr</u>, 424 F.3d 213, 227 (2d Cir. 2005) (<u>quoting United States v. Modica</u>, 663 F.2d 1173, 1178 (2d Cir. 1981)). The statements must amount to "flagrant abuse" (<u>United States v. Zichettello</u>, 208 F.3d 72, 103 (2d Cir. 2000)), not merely "adjectival excess." <u>Rivera</u>, 971 F.2d at 884.

The AUSA's comments did not prejudice the Defendant. Each example the defense cites pertains to the AUSA's assessment of defense counsel's argument in light of the evidence, not his personal opinion as to the truth or falsity of any of the evidence or testimony adduced at trial. The AUSA was not personally vouching for the credibility of his own witnesses or the reliability of the Government's evidence. When, as here, defense counsel has attacked the credibility of the Government's witnesses, "the prosecutor is entitled to reply with rebutting language suitable to the occasion." <u>United States v. Praetorius</u>, 622 F.2d 1054, 1060-61 (2d Cir. 1979). The AUSA's comments did not deny the Defendant a fair trial.[3] <u>See Rivera</u>, 971 F.2d at 884 (a prosecutor's

---

[3] Defense counsel did not timely object during rebuttal to any of the later complained of remarks. Defense counsel only contemporaneously objected once to the AUSA's choice of language during rebuttal, when the AUSA stated in responding to defense arguments that Sergeant Bartolomei had fabricated her translation, "I find it somewhat offensive that he'd even suggest it." Tr. 501:1-2. The Court sustained this objection, and the AUSA apologized for this rhetorical overstep. Tr. 501:3-5.

8

personal opinions that the defense's arguments were "ridiculous" did not constitute improper vouching).

### Introduction of the Defendant's Photo Did Not Prejudice the Defendant

Finally, Defendant argues that admission of a photograph of the Defendant that he characterizes as a "mug shot" was prejudicial. Def. Mem. at 9. The photograph was a direct head shot of the Defendant wearing a white tee shirt. The Defendant has no prior criminal record and there is nothing in the record that in any way suggests that he does. The Government displayed this photograph, Government Exhibit 401, on a display board next to the witness stand along with several other photographs of people involved in the events surrounding the shooting. Throughout the trial, some of the witnesses were asked to identify individuals, including the Defendant, in these photographs. Defendant argues that admission of this photograph was prejudicial because it made the Defendant "seem more guilty." Jan. 28, 2013 A.M. Tr. 49:11-12.

"The introduction at trial of mug shots of the defendant taken in connection with prior crimes [is] prejudicial error because the photographs [may] improperly inform[] the jury of the defendant's prior criminal record." United States v. Mohammed, 27 F.3d 815, 822 (2d Cir. 1994). When the Government seeks to introduce a photograph from a prior arrest, the Court must evaluate whether to admit the photograph based on a three-part test.[4] The Defendant has argued that the probative value of the photograph was substantially outweighed by its unfair prejudice under the standard balancing test of Fed. R. Evid. 403.

---

[4] To evaluate admissibility in this circumstance, "(1) the Government must have a demonstrable need to introduce the photographs; and (2) The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and (3) The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs." United States v. Harrington, 490 F.2d 487, 494 (2d Cir. 1973). Defendant claims that the photograph was prejudicial because it did not meet the first prong of this test. This test, however, is inapplicable in the instant case because the photograph was not procured from a prior arrest, and there was no evidence adduced at trial of any prior arrest. Thus, the photograph could not have improperly informed the jury of any (nonexistent) prior criminal record.

9

Government Exhibit 401 did not cause the Defendant any undue prejudice. It was not a "classic" mug shot: it did not depict the Defendant in prison garb, it did not depict the defendant in profile, and it did not contain prison identification numbers. The photo admitted depicted the Defendant (as the Court characterized it) "with probably a day old beard in a [white] T-shirt." Jan. 28, 2013 A.M. Tr. 49:2. It could have been a photograph from the Department of Motor Vehicles or one supplied by the Defendant himself. In fact, it was never clearly articulated by either side how this picture was obtained. See Jan. 28 2013 A.M. Tr. 45:23-51:13. Defendant cites no case where any admission of a photo alone constituted reversible error. Admission of the photo did not cause the jury to reach a "seriously erroneous result," as would be required for a new trial. Triumph Capital Group, Inc., 544 F.3d at 159; see also United States v. Giles, 2000 U.S. App. LEXIS 6894, at *4 (2d Cir. Apr. 13, 2000) (admission of photo arrays depicting "head-and-shoulders shots of casually dressed, young-adult men" were not "mug shots" and not unduly prejudicial).

## Conclusion

Both in isolation and taken together, the Government's rebuttal and the admission into evidence of a photo of the Defendant did not deny him a fundamentally fair trial. Defendant's motion for a new trial (ECF No. 76) is denied.

Dated: May 2, 2013
      New York, New York

SO ORDERED:

*[signature]*
GEORGE B. DANIELS
United States District Judge